# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs August 2, 2016

## STATE OF TENNESSEE v. ALEX GOODWIN AND JOEY LEE aka JOEY CURRIE

**Appeal from the Criminal Court for Shelby County**
**No. 1102877     W. Mark Ward, Judge**

---

**No. W2015-00813-CCA-R3-CD (C)  -  Filed June 7, 2017**

---

In this consolidated appeal as of right, Defendants Alex Goodwin and Joey Lee challenge their convictions of aggravated robbery, a Class B felony, <u>see</u> T.C.A. § 39-13-402, for which they received eleven and ten years' imprisonment, respectively.  Both Defendants challenge the sufficiency of the evidence supporting their convictions.  Defendant Goodwin argues that the trial court erred in (1) denying his motion to suppress text messages obtained from Defendant Goodwin's cell phone and (2) refusing to instruct the jury on facilitation as a lesser included offense of aggravated robbery.  Defendant Lee argues that the trial court erred in (1) admitting into evidence a BB gun located remotely in time and place to the offense without any testimony to connect the weapon to the offense; (2) allowing an expert witness to interpret the meaning of slang terminology used by the co-defendant in the text messages; and (3) the cumulative effect of the errors committed during trial denied him a fair trial.  Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT L. HOLLOWAY, JR., JJ., joined.

C. Anne Tipton, Memphis, Tennessee, for the Defendant-Appellant, Joey Lee; Blake Ballin (at trial), Benjamin Catz (at trial), and Joseph A. McClusky (on appeal), Memphis, Tennessee for the Defendant-Appellant, Alex Goodwin.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Omar Z. Malik and Gregory Gilbert, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

The victim, Latasha Jackson, had been in "a casual relationship" with Defendant Goodwin on Facebook for approximately a month before the instant offense. The first time she met Defendant Goodwin in person was the day after she told him she had cashed her income tax check. She spent that day running various errands with Defendant Goodwin, who was texting someone on his cell phone the entire time he was with the victim. Defendant Goodwin ultimately directed the victim to drive to a certain location. Once there, two men, one armed with a gun and later identified as Defendant Lee, approached the victim and demanded money. The men ultimately ran off, taking the victim's money, purse, jacket, and cell phone. Based on "suspicious statements" provided by Defendant Goodwin to the police, he was developed as a suspect in the robbery and charged with the instant offense. Defendant Lee was indicted following review of his cell phone communications with Defendant Goodwin on the day of the offense and the discovery of the victim's cell phone in his bedroom.

**Motion to Suppress Hearing.** Defendant Goodwin filed a motion to suppress arguing that his initial detention violated the state and federal constitutions because it was not supported by probable cause. His motion also alleged that "his consent to search [his cell phone] was not voluntarily given" because it was given only after he was threatened with being placed "on a forty-eight hour hold."

On February 19, 2014, the trial court conducted a hearing on Defendant Goodwin's motion to suppress. Sergeant Eric Kelly of the Memphis Police Department testified that he investigated the instant aggravated robbery on February 11, 2011, and he identified Defendant Goodwin in court. He responded to 3395 Wild Rye Lane, in the Village Green Apartments, in Memphis on the night of the offense. When he arrived on the scene, the victim was in her car with her children and Defendant Goodwin was seated in the back of a uniform patrol car. Sergeant Kelly explained that Defendant Goodwin was seated there because he had given other officers a false name. After speaking with the victim, Sergeant Kelly spoke with Defendant Goodwin, who advised him that he gave the officers a "bad name" because he thought he had a warrant. He then told Sergeant Kelly that "he was ready to tell the truth about what happened." Sergeant Kelly testified that Defendant Goodwin was considered a victim at the time he was transported to 201 Poplar to provide a statement.

Prior to taking Defendant Goodwin's formal statement, Sergeant Kelly advised Defendant Goodwin of his Miranda rights, which he waived. The Advice of Rights Miranda Warning Waiver Form memorializing his waiver and Defendant Goodwin's formal statement were identified during the hearing. Although the transcript reflects that

they were admitted as exhibits to the hearing, they are not included in the record on appeal.

On cross-examination, Sergeant Kelly conceded that his supplemental report reflected that Defendant Goodwin was considered a "victim/possible suspect." He explained that this portion of the report was completed after the investigation. He further explained that Defendant Goodwin was located in the back seat of the patrol car because "it was typical procedure" to obtain victim statements separately. Sergeant Kelly later conceded that after obtaining information from the female victim, Defendant Goodwin was not free to leave the scene of the offense. Although Defendant Goodwin was not handcuffed once he arrived at 201 Poplar, he was not free to leave until after he provided his statement.

Defendant Goodwin testified that when uniform police officers arrived on the scene on the night of the offense, he was immediately placed in the back of the patrol car. He explained that "he got a lady in the apartments" to call the police because they had just been robbed. Defendant Goodwin clarified that police asked him "what happened," before he was placed in the patrol car. He told the police they had been robbed, but he did not know who did it. He said he was in handcuffs in the back of the patrol car for "hours" before he spoke to Sergeant Kelly. He explained that he had left his phone in the female victim's car, and Sergeant Kelly approached him in the patrol car and asked, "[I]s this your phone?"

When Defendant Goodwin arrived at 201 Poplar, he was told he was a "suspect" and faced especially aggravated robbery charges. He said he was left in a room, handcuffed to a chair. He agreed that he signed the waiver form and explained

> What was told to me was that he already had my phone. Either that I was going to let him keep my phone and he let me go to where he can search my phone or I won't, I won't let him get my phone and I go to jail and he'll get my phone anyway. That's what, that's what he told me.

Asked what he thought would happen if he did not allow Sergeant Kelly to have his phone, Defendant Goodwin replied

> That I would be going to jail. Because he wrote the statement, before he started asking me about the statement he put on there, he showed me what he was doing. He said I'm investigating you as a suspect and that's why I asked him, sir, why are you investigating me as a suspect and I'm a victim and I'm innocent. And he pointed out that that he was trying to make me a

- 3 -

suspect. That's what made me feel threatened and scared because he told me that I was a suspect and I knew I wasn't a suspect.

On cross-examination, Defendant Goodwin denied giving police a false name. He also denied telling the officers where to find the people he was alleged to have been there to meet. He also denied telling the female victim not to do anything and that he wanted her to drop him off at the mall.

The trial court asked Defendant Goodwin a series of questions including, "When did you decide you didn't want to talk to the police?" Defendant Goodwin replied, "I never decided that I didn't want to talk to the police." The trial court pressed Defendant Goodwin and asked, "When did you want to stop cooperating with the police in investigating your own robbery?" Defendant Goodwin said, "I didn't. I never said that I didn't want to give a statement." Defendant Goodwin explained that he felt threatened when he became viewed as a suspect by the police. The trial court told the parties it wanted to hear from the patrol officers who placed Defendant Goodwin in the patrol car and reset the matter.

On May 21 and May 22, 2014, the trial court held another bifurcated hearing on the motion to suppress. The victim testified that she met Defendant Goodwin through Facebook and had known him for approximately a month prior to the offense. She identified him in court. On February 11, 2011, the victim was with Defendant Goodwin in person for the first time. They went out to eat at Applebees, picked up her children from daycare, and she drove Defendant Goodwin to some apartments in East Memphis. She had money from her income tax check with her, which was almost $7,000 in cash. She told Defendant Goodwin she was in possession of the money before she picked him up.

She took Defendant Goodwin to one set of apartments, he got out, knocked on the door and no one answered. She then took him to another set of apartments. The entire time she was with him, Defendant Goodwin was texting with someone. He never indicated with whom he was texting. She explained that she was eventually robbed. She said:

Two people came up and one stood beside a light pole which is [Defendant Lee], on my side, behind the car. And the other one was standing on the other side, on the side that [Defendant Goodwin] was on. And he would get out to smoke and the person that was on his side asked him for a light and he would light it for him. And he did it, like, three times and like the last time they got into an altercation, I guess.

- 4 -

The victim identified Defendant Joey Lee at the motion to suppress hearing. She said Defendant Lee came up on her side of the car, opened the door, pointed a gun at her back, and said, "Give me the money, B****." She repeatedly told Defendant Lee that she did not have any money, and Defendant Goodwin told her to "Give him the purse, give him the purse." The victim said that ultimately her purse was taken from under her seat and her jacket was taken from off the back of her seat. The victim's four children were in the car at the time of the offense. The victim said she eventually found her car keys, which Defendant Lee threw in the snow. She noted that Defendant Goodwin told her to "just leave, don't worry about it, go home, drop him off at the mall." She went back to the apartments, located a security guard and used his phone to call the police.

Upon the arrival of the police, the victim described the perpetrator and eventually provided a written statement. She also told the police of her suspicion that Defendant Goodwin was somehow involved in the offense because he had been texting the entire time while with her. She was provided with a photographic line-up, from which she identified Defendant Lee. On cross-examination, she said that Defendant Goodwin got out of the car three times to talk to another unknown individual on the night of the offense. She explained that the first time Defendant Goodwin got out of the car was in response to the unknown individual knocking on the window and saying, "Hey man, I need a light." The second time Defendant Goodwin got out of the car, he smoked a cigarette with the unknown individual. The third time Defendant Goodwin got out of the car, an altercation, described as "tussling or fighting, or something occurred." The victim explained that although she did not see any physical contact, the other unknown individual "grabbed" Defendant Goodwin and put him back in the car.

After the two men obtained the victim's belongings, they ran. Defendant Goodwin said, "Oh, my head, my head." The victim proclaimed they just robbed me, and Defendant Goodwin responded they robbed him too, referencing the $40 that the victim had given to him. She clarified that Defendant Goodwin remained with her seated on the passenger side of her car until the police arrived. Upon further clarification, the victim said she did not see Defendant Goodwin being taken out of her car the second time.

Officer James Tedford with the Memphis Police Department was working from 2:00 p.m. to 10:00 p.m. on the day of the offense. He responded to a robbery call at 3395 Wild Rye Lane in Memphis, Tennessee. He testified that the scene officer advised that Defendant Goodwin said that he was meeting friends at the two apartments. In response, Officer Tedford went to the two apartment locations. The first apartment location was determined to be vacant. At the second location, the resident said she had no knowledge of Defendant Goodwin.

Sergeant Kelly also responded to the scene. When he arrived, the victim was

seated in her car and Defendant Goodwin was in the backseat of the patrol car. Defendant Goodwin was not handcuffed when Sergeant Kelly arrived on the scene. Sergeant Kelly told the officers to transport the victim and Defendant Goodwin to 201 Poplar to obtain their statements. Neither individual was in custody, considered a suspect, or under arrest at the time. Defendant Goodwin initially advised Sergeant Kelly that he had gone to dinner with his girlfriend on the opposite side of town, and that they were coming to that apartment complex in east Memphis to meet somebody to purchase some marijuana. Sergeant Kelly advised him that "his story didn't sound very believable," presented him with an advice of rights form, and advised Defendant Goodwin of his Miranda rights. Defendant Goodwin appeared to understand his rights, waived his right to an attorney, did not appear to be under the influence of any drugs or intoxicants, and signed the form.

Defendant Goodwin then recounted the statement he had previously told Sergeant Kelly. However, he added that he had been texting the individual they were to meet throughout the night. Defendant Goodwin's battery on his phone, which he alleged could verify his story, had no battery charge. Sergeant Kelly made attempts to locate a charger that fit Defendant Goodwin's phone but was unable to find one. Since they were unable to locate a phone charger, Sergeant Kelly asked Defendant Goodwin "if he had a problem with leaving the phone with him" to which Defendant Goodwin said no and gave him the phone. Defendant Goodwin was subsequently released, and his phone was tagged into evidence.

On cross-examination, Sergeant Kelly acknowledged that the victim was allowed to go home and drop off her children while Defendant Goodwin was immediately taken to 201 Poplar. Sergeant Kelly further testified that had Defendant Goodwin asked to go home rather than 201 Poplar, "it would have been his option[.]" He further confirmed that some of his reports listed Defendant Goodwin as a "victim/possible suspect;" but he did not have enough evidence or "probable cause" to charge Defendant Goodwin with an offense that night. He agreed that he made handwritten notes on the night of the offense but could not recall where they were.

The trial court, sua sponte, questioned the parties to determine the time frame involved. Defendant Goodwin provided his statement at "[a]bout 11:00 p.m." or almost midnight. He was transported to 201 Poplar by a uniform patrol officer, who did not testify at the hearing.

Andre Pruitt, a sergeant with the Memphis Police Department at the time of the offense, testified that he was assigned the case the day after the offense or on February 12. Sergeant Kelly had advised him that he had received a signed phone consent form to search Defendant Goodwin's cell phone and that the victim had been robbed of $6,500

while out on a date with a friend. He retrieved the phone from the property room and discovered text messages. The text messages were "just basically about a robbery." Although Sergeant Kelly advised him that they had consent to search the phone, Sergeant Pruitt also had obtained a search warrant to search the phone. The search warrant was admitted as an exhibit to the hearing. Asked whether he searched the phone after he obtained the search warrant, Sergeant Pruitt replied

> Well, Sergeant Kelly had already told me that the consent was signed and I want to say that we started looking at it, then I was advised that we shouldn't do it without a search warrant, so I went on and got the search warrant and then I came back and continued looking through the phone.

Sergeant Pruitt then searched the phone during the relevant time period and discovered text messages of value. He developed a photographic line-up, performed a background check on Defendant Goodwin to determine who he had been arrested with previously. Sergeant Pruitt identified the text messages he retrieved from Defendant Goodwin's phone, which were exhibited to the hearing. He confirmed that one of the suspects he developed was Defendant Lee, who was a past associate of Defendant Goodwin. Sergeant Pruitt went to Defendant Lee's home, obtained consent to enter, searched the home, and discovered the victim's cell phone in Defendant Lee's bedroom on the nightstand.

On cross-examination, Sergeant Pruitt confirmed that there was a written consent to search form for Defendant Goodwin's cell phone; however, he did not bring it with him to the hearing. He explained that Sergeant Kelly had it prior to his involvement in the case. He confirmed that he actually saw the written consent form to search Defendant Goodwin's phone. He further explained that he obtained a search warrant for the phone because he was new to the bureau and a veteran officer told him to obtain the warrant. He prepared the affidavit in support of the search warrant. He recalled the chronology of events in the investigation: photographic line-ups were done at 2:06 and the warrant was signed at 3:00. He obtained Defendant Lee's name by conducting a criminal background check on Defendant Goodwin. He determined that Defendant Lee had been previously arrested with Defendant Goodwin. He confirmed that he had viewed Defendant Goodwin's phone prior to the line-ups and prepared two photographic line-up containing Defendant Goodwin's associates, both of which were shown to the victim. When he went to Defendant Lee's house, the victim had already identified Defendant Lee from the photographic line-up. He did not; however, have an arrest warrant or a search warrant.

The defense argued that Defendant Goodwin's cell phone was obtained as a result of an illegal detention. Moreover, they asserted that even if the detention was not illegal, no consent was given by Defendant Goodwin to search his phone. Regardless of the

testimony about the consent, the consent to search form was not offered into evidence. After considering the arguments, the trial court denied the motion, reasoning that the officers had probable cause to arrest Defendant Goodwin at the time he was released, even though they did not think they did.

**Trial.**  The trial was held February 9 through February 13, 2015.  The victim testified, in large part, consistently with her testimony at the motion to suppress hearing. After she parked her car by an orange Camaro, as directed by Defendant Goodwin, she observed two men.  One was by a light pole on her side of the car and the other was on Defendant Goodwin's side of the car.  The man on Defendant Goodwin's side of the car asked him for a light, and Defendant Goodwin got out of the car to smoke a cigarette. When Defendant Goodwin returned to the car, the victim overheard him tell someone on the phone "be careful [']cause the police were in the apartments.  They were at the front of the apartment."  Defendant Goodwin then exited the car to smoke another cigarette and was assaulted by the man on the right side of her car.  Defendant Goodwin returned to the victim's car, and the other man, she had previously seen near the light pole, pointed a gun at the small of her back.

The man, later identified as Defendant Lee, said, "Give it to me, b****."  The victim repeatedly told him that she did not have anything.  She was willing to get out of the car and allow Defendant Lee to search her but he told her she "better not get out this damn car."  The victim asked, "[Y]ou going to do this in front of my kids?"  As the man continued to demand money from her, Defendant Goodwin told her to "just give him the purse."  The victim's purse was located underneath her seat, not visible to anyone other than Defendant Goodwin, who was in the passenger seat.  The victim said, "the next thing [she] knew," the men were running away.  The victim's keys, purse, coat, and cell phone were missing from her car.  She described her phone as an "HTC My Touch."

She later provided a statement to police concerning the offense, at which time she identified Defendant Lee from a photographic line-up.  The advice of rights form and the photographic line-up were admitted into evidence at trial.  Below Defendant Lee's photograph, the victim wrote:

> This is the person that robbed me.  Put a gun in my back and my neck and took $6500, my social security card, my kids social security card, my bank card, my purse, my - - and coat, my My Touch, (indiscernible) from me.

The victim explained that she had recently purchased the phone that was taken from her in the robbery.  She still had the box it came in, which was admitted as an exhibit at trial, and the serial number for the phone.  She provided this information to the police and was present when they matched the serial number from the box to the serial

number from the phone they recovered from Defendant Lee's home. Approximately $1500 and the victim's phone and purse were returned to her. She confirmed that someone hit Defendant Goodwin on the night of the offense, but he did not suffer any injuries.

On cross-examination by Defendant Goodwin, the victim clarified that she told Defendant Goodwin that she had cashed her income tax check but did not tell him the exact amount of money she had received. She also confirmed that she gave Defendant Goodwin approximately $40 or $50 to pay a light bill. On redirect examination, the victim described the gun used in the robbery as a black "9 millimeter automatic gun." She also clarified that Defendant Lee was standing at her car door and that he had nothing covering his face.

Officer Steven Logan of the Memphis Police Department was on routine patrol on the night of the offense and responded to a robbery call at 3395 Wild Rye Lane in Memphis, the location of the offense. Upon arrival, he observed a male and female victim, both of whom reported being robbed at gunpoint. He testified that the female victim advised him that the robbery occurred between 6:50 p.m. and 7:10 p.m. Defendant Goodwin, viewed as the male victim at that time, told Officer Logan that he was hit in the "crown of his head" with a gun; however, Officer Logan did not observe any cuts, bruises, bleeding, or swelling.

Defendant Goodwin also told Officer Logan that he was there to meet a friend, but the friend was never on the scene. Officer Logan checked the apartments where Defendant Goodwin said he was supposed to meet his friend and determined that "no such people existed or even knew of [Defendant Goodwin]." Based on these statements and the absence of any visible injury from the alleged assault, Defendant Goodwin was developed as a possible suspect. After Defendant Goodwin provided the "somewhat suspicious" statements, Officer Logan separated Defendant Goodwin from the female victim and detained him in the backseat of the squad car.

Officer Logan followed the victim to her residence to drop off her children, and then he followed her to 201 Poplar where she provided a statement concerning the offense. Officer Logan obtained contact information from Defendant Goodwin, and he provided a cell number of (901) 791-82**. On cross-examination by Defendant Goodwin, Officer Logan confirmed that his police report stated, "Suspect Number 1, unknown, struck [Defendant Goodwin] in the head several times and demanded money[.]" He further acknowledged that there was no mention of Defendant Goodwin being struck in the head with a gun in his report. He clarified that Defendant Goodwin provided a "direct statement" that he was hit in the head with a gun. Officer Logan could not recall if both suspects were armed with a gun. On cross-examination by Defendant

Lee, Officer Logan clarified that he did not include any information about Defendant Lee in his report and that officers in the felony response unit may have added additional information to his report.

Sergeant Pruitt requested Officer David Galloway, a crime scene investigator with the Memphis Police Department, to respond to 6108 Waterstone Oak Way, Apartment 101, Defendant Lee's residence, on February 13, 2011. Various photographs taken by Officer Galloway of items recovered from Defendant Lee's bedroom were offered into evidence at trial including a jacket, a wallet, an array of money, and the victim's cell phone. Prior to Officer Galloway's testimony, defense counsel objected to exhibits 12 and 17, photographs of a box found in Defendant Lee's bedroom that contained a black and silver, automatic BB gun. Defense counsel jointly argued that there had been no proof that the BB gun was the weapon used in the instant robbery; therefore, it was not relevant and prejudicial under Rule 403, 404. The trial court ultimately overruled the objection and admitted the photographs and BB gun into evidence.

Sergeant Eric Kelly testified consistently with his testimony at the motion to suppress hearing. He additionally stated that he typed his report of his interaction with Defendant Goodwin and forwarded it to the robbery bureau. On cross-examination by Defendant Goodwin, Sergeant Kelly agreed that Defendant Goodwin was cooperative during the investigation. He willingly spoke with the police and provided them with his cell phone, even though he was advised he was not required to do so. On cross-examination by Defendant Lee, Sergeant Kelly said that police reports are entered into one main computer system. Other officers have the ability to amend or make corrections to the report; however, this is monitored and tracked.

William Merritt, a sergeant with the Memphis Police Department at the time of the offense, executed a search warrant for phone number (901) 553-81**, issued to Defendant Lee. He received certified records from Kristin Campbell of Sprint. Through his request, he obtained historical information from the cell phone for February 11, 2011, the date of the offense. The cell phone records were admitted into evidence at trial. The records showed that Defendants Goodwin and Lee communicated with each other approximately thirty times on the day of the offense. On cross-examination by Defendant Lee, Sergeant Merritt confirmed that he did not obtain cell phone records for Defendant Lee's cell phone from February 10, 2011. On redirect examination, Sergeant Merritt said he attempted to obtain information about Defendant Lee's text messages but was unable to do so.

Sergeant Pruitt testified consistently with his testimony at the motion to suppress. He additionally described in detail the text messages he obtained from Defendant Goodwin's and Defendant Lee's cell phones. Upon being assigned the case, he obtained

Defendant Goodwin's cell phone from the property and evidence room, charged the phone, and read the following text message on Defendant Goodwin's cell phone:

> [W]hen you get off the freeway or the expressway bring her to the back of the apartments. And the police is at the school right now, so bring her around to the back, and we'll do it -- hit the lick there.

After reading the text message, Sergeant Pruitt determined that Defendant Goodwin was involved with the instant offense. The text messages were photographed and admitted into evidence at trial. The following chart illustrates the text messages that were exchanged between Defendant Goodwin's and Defendant Lee's cell phones on the night of the offense:

| TIME (P.M.) | SENT BY | MESSAGE |
| --- | --- | --- |
| 5:38 | Defendant Goodwin | Everythang covered doe |
| 5:39 | Defendant Lee | Ok what kind of carZ |
| 5:39 | Defendant Goodwin | Impala black |
| 5:40 | Defendant Lee | Were you atZ |
| 5:40 | Defendant Goodwin | We fina get off da eway cuz |
| 5:43 | Defendant Lee | Tell her to come in da back like you said at 1st da back wayZ |
| 5:44 | Defendant Goodwin | Which one cuz |
| 5:45 | Defendant Lee | Da last drive way on da side by da schoolZ |
| 5:48 | Defendant Goodwin | Police at tha school cuzz |
| 5:49 | Defendant Lee | Whats upZ |
| 5:49 | Defendant Goodwin | Im by da second drive way |
| 6:09 | Defendant Goodwin | Police in here |
| 6:18 | Defendant Goodwin | Ima get out tha car and smoke my bllacc ask me fa da light ima leave it in da car den dats wen u go |
| 6:24 | Defendant Goodwin | Wats up |
| 6:27 | Defendant Goodwin | Tel me sum |
| 6:25 | Defendant Lee | On da wayZ |
| 6:29 | Defendant Lee | Bra this shit crazy right now in ready to hit this lick I need the car off so she want drive offZ |

Sergeant Pruitt also determined that Defendant Lee lived approximately a quarter of a mile from the offense location. He identified Defendant Lee at trial and explained that he had obtained consent to search Defendant Lee's home. Sergeant Pruitt was asked

if he knew what the phrase "to hit this lick" meant in his experience as a police officer. Defense counsel for Defendant Goodwin objected, arguing that Sergeant Pruitt had not been qualified as an expert "on interpreting language" and that he had not received notice of any expert witnesses. The trial court overruled the objection, cautioning the State to narrow the question to "what is the common parlance" of the phrase. The State asked Sergeant Pruitt, "What's common parlance for hit this lick?" Sergeant Pruitt replied, "Means hit a robbery."

During the search of Defendant Lee's home, Sergeant Pruitt also recovered a jacket with money inside, the victim's cell phone, the victim's wallet with her identification inside, and $1600 cash. He also determined that "the little card that goes in the [victim's] phone to make it work" belonged to Defendant Lee, not the victim. Sergeant Pruitt obtained the serial number to the victim's phone from her and confirmed that it matched the serial number to the cell phone recovered from Defendant Lee's bedroom. A photograph of the box the phone was purchased in, containing the serial number to the phone, was admitted into evidence at trial. He returned the victim's property to her. The State rested its case.

Defendant Goodwin chose not to testify or offer proof on his own behalf. Defendant Lee offered the following proof at trial. Treasure Gaither, Defendant Lee's girlfriend from 2009 to 2012, testified that she was with Defendant Lee on February 11, 2011, the night of the offense. She remembered that day because she left work early for a pre-Valentine's Day celebration with Defendant Lee. She said she left work at 6:30 p.m. and picked-up Defendant Lee from his home at 6:45 p.m. They went shopping at a clothing store, out to dinner, and then to a casino. She said they stayed at the casino until 3:00 a.m., and returned to Defendant Lee's home. Gaither testified that she remained at Defendant Lee's home until the police arrived on February 13, 2011.[1] She did not attempt to talk to the police at that time.

Defendant Lee, age twenty-five, testified that he completed high school and attended Delta Tech for his certification in welding. He confirmed dating Gaither and denied encouraging her to testify to a falsehood. He met Defendant Goodwin at age fourteen or fifteen when they were on the same drum-line in a music group called "Wolf Pack." Defendant Lee agreed that he "talked and texted" with Defendant Goodwin on the day of the offense. Defendant Lee admitted that at the time of the offense he sold marijuana and that Defendant Goodwin was one of his regular customers. According to Defendant Lee, on the night of the offense, Defendant Goodwin was communicating with

---

[1] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. or Mrs. or by his or her proper title.

him "to get served or buy drugs," and he had agreed to sell him marijuana. Defendant Lee explained his process as follows:

> Basically I, you know, tell him where I'm at if I'm not at home. Or I'll ask where he's at. We'll meet. It was different ways. It's all in what's convenient at the moment.

On the night of the offense, Defendant Goodwin was supposed to meet Defendant Lee at his house. He could not remember the exact time Defendant Goodwin was to arrive but said it was "probably around four [or] five." Defendant Lee said Defendant Goodwin never came to his house. He recalled Gaither arriving at his house "right before seven o'clock." He testified consistently with Gaither's testimony concerning their whereabouts on the night of the offense. He explained that the text messages were "basically setting up the deal to buy." He further explained that he bought a cell phone from "Bucky," a guy from the neighborhood, around 6:30 p.m. on the night of the offense. He purchased the phone because it was in good condition, paid $50 for it, and thought it was a "good deal."

Defendant Lee confirmed that he also used the name "Joey Curry." His mother's ex-husband's last name was Curry, and he did not complete the process of adopting Defendant Lee. This caused Defendant Lee problems because his identification "didn't match [his] social security or his identification and his birth certificate never matched." After Defendant Lee completed school, he returned to using his family's maiden name Lee.

On cross-examination, Defendant Lee explained the text regarding "hit this lick" and "need[ing] the car off so she won't drive off" as follows:

> Basically Bro, this shit is crazy, that was due to all of the police action that was around the house, okay, as far as him coming to buy drugs from me. And if he was coming to my house and he was going to be buying drugs from me, I needed her to be sitting in there not with the car on causing attention to my house.

Asked if he thought it was important for Gaither to come forward to the police with her information, Defendant Lee replied, "I was waiting for my day to actually come forward and have my voice heard." On redirect examination, Defendant Lee further clarified his text "hit this lick" to Defendant Goodwin meant, "I was ready to make the service so I can go on about my business." He denied "hit a lick" meant to rob the victim.

The jury convicted the Defendants as charged. This timely appeal followed.

## ANALYSIS

**Motion to Suppress.** Defendant Goodwin argues that the trial court erred in denying his motion to suppress the text messages obtained from his cell phone. He specifically contends that he was seized without a warrant when he was placed in the back seat of the police car, taken to 201 Poplar, and locked in an interrogation room. As a result of his illegal seizure, Defendant Goodwin insists that the text messages should be suppressed as fruit of the poisonous tree. Defendant Goodwin also argues, for the first time on appeal, that he was not properly advised of his <u>Miranda</u> warnings, which violated state and federal constitutional protections against compelled self-incrimination.[2] In response, the State contends, and we agree, that the trial court properly denied the Defendant's motion to suppress.

When evaluating a trial court's ruling on a motion to suppress, this court may consider the proof presented at both the suppression hearing and at trial. <u>State v. Williamson</u>, 368 S.W.3d 468, 473 (Tenn. 2012) (citing <u>State v. Henning</u>, 975 S.W.2d 290, 297-99 (Tenn. 1998)). "A trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." <u>State v. Williams</u>, 185 S.W.3d 311, 314 (Tenn. 2006) (citing <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

<u>Odom</u>, 928 S.W.2d at 23. However, this court's review of a trial court's application of the law to the facts is de novo. <u>State v. Day</u>, 263 S.W.3d 891, 900 (Tenn. 2008) (citing <u>Williams</u>, 185 S.W.3d at 315; <u>State v. Yeargan</u>, 958 S.W.2d 626, 629 (Tenn. 1997)).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens from unreasonable searches and seizures. <u>See</u> U.S. Const. amend. IV; <u>see also</u> Tenn. Const. art. 1, § 7. The purpose of these

---

[2] Our review of Defendant Goodwin's Fifth Amendment claim on appeal is waived for failure to properly raise it before the trial court and failure to provide this court with any meaningful argument or citation to the record in support of this issue.

- 14 -

constitutional protections is to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1989) (quoting Camara v. Mun. Court, 387 U.S. 523, 528 (1967)). "The touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991) (citing Katz v. United States, 389 U.S. 347, 360 (1967)). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629 (citing Coolidge v. New Hampshire, 403 U.S. 403, 454-55 (1971)). Accordingly, the State bears the burden of establishing by a preponderance of the evidence that a warrantless search or seizure is constitutional. See, e.g., State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998).

Not all police-citizen encounters implicate constitutional protections. See, e.g., State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006). The Tennessee Supreme Court has formerly recognized three tiers of interactions between law enforcement and private citizens: "(1) a full scale arrest which must be supported by probable cause; (2) a brief investigatory detention which must be supported by reasonable suspicion; and (3) brief police-citizen encounters which require no objective justification." State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000) (citations omitted). Of these categories, "only the first two rise to the level of a 'seizure' for constitutional analysis purposes." Day, 263 S.W.3d at 901. "[W]hat begins as a consensual police-citizen encounter may mature into a seizure of the person." Daniel, 12 S.W.3d at 427. A seizure occurs "'when the Officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" Day, 263 S.W.3d at 901-02 (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). The relevant inquiry is "whether, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed he or she was not free to leave.'" State v. Randolph, 74 S.W.3d 330, 336 (Tenn. 2002) (quoting Daniel, 12 S.W.3d at 425).

Following many hearings, the trial court ultimately denied relief, reasoning as follows:

> [G]oing back to the original thing, then I've got, whether this was an illegal detention, or not, I've got conflicting stories. Basically, your client's version is that he was illegally detained. I've got some corroboration of that in a sense from the other victim of the crime testifying that she thought he was arrested. And from the police officer at the scene, the female officer at the scene that indicated to the other victim that an arrest is going to be made.

And then I've got [Sergeant] Kelly who testifies that it was simply transporting down to take a victim's statement. I've got some conflicting testimony there, about when the arrest occurred.

However, the facts that I reiterated at the beginning of this hearing, I think, gave the officers probable cause to effectuate an arrest at the scene, by the time they transported him down there.

Any placing in and out of cars that occurred, initially was a consensual encounter by a victim of a crime, who was reporting the crime and giving their statements to the police. At some point that ripened into a custodial situation.

[Defense counsel's] claiming right there at the scene, if it did occur that way I think the information that they had at that time, including the fact that the defendant's story was not checking out gave them probable cause at that point, so.

I am going to deny the motion to suppress. I think they had probable cause, even those officers may not have thought they had. They had probable cause from the beginning, based on the information that was obtained.

We agree with the trial court and conclude that the initial encounter between Defendant Goodwin and the police was consensual. Here, Defendant Goodwin summoned the police to his aid after an alleged robbery. There is no question that Defendant Goodwin's initial interaction with the police was voluntary. When the police arrived, Defendant Goodwin provided them with a false name and a bogus story concerning who he was to meet at the apartments. When the police attempted to confirm Defendant Goodwin's story, they determined that no one at the apartments he directed them to knew who he was. The police further confirmed that Defendant Goodwin did not have any injuries, even though he said he had been hit. Upon further investigation into the robbery, the victim told police that Defendant Goodwin had been texting someone the entire day and that he was the one who directed her to the parking area where the robbery occurred. Even though the officers did not believe they had probable cause to arrest Defendant Goodwin, at this point, they had probable cause to arrest Defendant Goodwin. In fact, the only evidence the officers did not have was the substance of the text messages and the victim's cell phone. Accordingly, the trial court properly denied the motion for new trial.

**Sufficiency of the Evidence.** Both Defendants argue the evidence is insufficient to support their convictions. Defendant Lee argues that the victim's testimony was not

credible. Defendant Goodwin argues that he was also a victim during the robbery and that the officer's interpretation of his text messages was "off base." The State argues, and we agree, that the evidence is sufficient to support the Defendants' convictions.

When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." When considering the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

Robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). As relevant to the present case, aggravated robbery is a robbery that is "[a]ccomplished with a deadly

weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Id. § 39-13-402(a)(1).

Taken in the light most favorable to the State, the proof at trial showed that the victim told Defendant Goodwin the day before the robbery that she intended to cash her income tax check. Before picking up Defendant Goodwin the next day, she told Defendant Goodwin that she had the money with her. She spent the entire day with Defendant Goodwin. During that time, Defendant Goodwin was persistently texting someone. She drove to a location, as directed by Defendant Goodwin, where the robbery occurred. The victim identified Defendant Lee as the individual who pointed a gun at the small of her back and her neck. There was nothing obstructing Defendant Lee's face. When Defendant Lee demanded the victim's money, Defendant Goodwin told her to give him her purse. Although the victim did not see how or who took her belongings, her purse was underneath her seat, visible only to Defendant Goodwin. After the victim reported the robbery to the police, Defendant Goodwin provided false statements as to the apartments he previously visited to meet a friend. Text messages between Defendants Goodwin and Lee demonstrated they were attempting to make some "quick money" at the victim's expense. Finally, the victim's cell phone that was taken in the robbery was discovered in Defendant Lee's bedroom two days after the robbery. Both Defendants make fact-based challenges to their convictions. These facts, and inferences therefrom, were resolved against them by the jury, and this court will not disturb that finding. Accordingly, there was sufficient evidence from which any rational trier of fact could find the Defendants guilty of aggravated robbery. They are not entitled to relief.

**Facilitation as Lesser Included Offense.** Defendant Goodwin argues the trial court erred in refusing to instruct the jury as to facilitation. Generally, the trial court has a duty to give a correct and complete charge of the applicable law. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000). The right to a correct and complete charge is constitutional, and each issue of fact raised by the evidence should be submitted to the jury with proper instructions. Dorantes, 331 S.W.3d at 390. A jury charge should contain no statement which is inaccurate, inapplicable, or which might tend to confuse the jury. State v. Hatcher, 310 S.W.3d 788, 812 (Tenn. 2010). Jury instructions must be reviewed in their entirety, and no phrase is examined in isolation. State v. Rimmer, 250 S.W.3d 12, 31 (Tenn. 2008). Whether a jury instruction is required by the facts of a particular case is a mixed question of law and fact. State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013). The question of whether a jury instruction should have been given is reviewed de novo with no presumption of correctness. Id.

Upon review of whether a trial court erred in failing to instruct the jury on a lesser included offense, this court considers the following three questions: (1) whether the offense is a lesser included offense; (2) whether the evidence supports a lesser included

offense instruction; and (3) whether the failure to give the instruction is harmless error. State v. Banks, 271 S.W.3d 90, 124 (Tenn. 2008) (citing State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002)).

As relevant here, "An offense is a lesser included offense if: (1) [a]ll of its statutory elements are included within the statutory elements of the offense charged; [or] (2) the offense is facilitation of the offense charged or of an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1)[.]" T.C.A. §§ 40-18-110(f)(1)-(2). Accordingly, facilitation of aggravated robbery is a lesser included offense of aggravated robbery. Id. § 40-18-110(f)(2). Tennessee Code Annotated section 39-11-403(a) states, "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required from criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." In other words, a person guilty of facilitation has supplied substantial assistance to the principal without the intent to promote, assist in, or benefit from the crime. See State v. Fowler, 23 S.W.3d 285, 287 (Tenn. 2000).

Tennessee Code Annotated section 40-18-110(a) provides the standard for determining whether the evidence is sufficient to require an instruction on a lesser included offense, stating:

> . . . [T]he trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense.

However, our supreme court has stated that instructions as to the lesser included offenses of facilitation, attempt, and solicitation are not necessary "where the evidence clearly establishes completion of the criminal act or simply does not involve proof of solicitation or facilitation." Banks, 271 S.W.3d at 125 (footnote omitted); see also Allen, 69 S.W.3d at 188 (stating that proof of the greater offense will not necessarily prove a lesser included offense of facilitation, attempt, or solicitation); see also State v. Ely, 48 S.W.3d 710, 719 (Tenn. 2001).

At the close of the State's proof, the trial court began discussing its proposed charge to the jury. It advised the parties that it would charge all lesser included offenses

except solicitation and facilitation. The trial court reasoned:

> No facilitation. I haven't heard anything that would justify facilitation. Based on what I've heard so far, I really haven't heard anything under that standard of State v. Robinson, 146 S.W.3d 469, based on this proof, no reasonable jury could conclude that from this evidence that [Defendant Goodwin] had the knowledge required by facilitation but lacked the intent required for criminal responsibility.

We agree with the trial court and conclude that there is no proof in the record which indicates that Defendant Goodwin merely "furnishe[d] substantial assistance in the commission of [aggravated robbery]" without possessing the intent to "promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense[.]" T.C.A. §§ 39-11-403(a), -402(2). Defendant Goodwin initiated the contact with the victim. He knew the victim had a large amount of money with her on the day of the offense. He was text messaging the entire time he was with the victim. He directed the victim to the location where the robbery occurred. The text messages also showed that Defendant Goodwin was an active participant in the robbery. Because Defendant Goodwin did more than facilitate the robbery, a jury instruction on facilitation was not necessary. He is not entitled to relief.

**Admissibility of BB Gun.** Citing State v. Eric Williams, No. W2013-01593-CCA-R3-CD, 2015 WL 1453389, at *15 (Tenn. Crim. App. Mar. 27, 2015), Defendant Lee argues the trial court erred by admitting into evidence a BB gun located remotely in time and place to the offense without any testimony to connect the weapon to the offense. In response, the State contends that the trial court properly admitted the BB gun. We agree with the State.

We review this issue mindful that evidence is relevant and admissible at trial only if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). "Under this standard, we will not reverse unless the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (internal quotations and citations omitted).

In Eric Williams, the defendant shot and killed the victim after returning home from a nightclub. No weapon was recovered in the case, and the State had no evidence about the defendant's weapon except that it was possibly an old, double barrel shotgun. Nevertheless, the State offered expert testimony from an agent with the Tennessee Bureau of Investigation (TBI) concerning "the trigger pull of various shotguns, most of which had nothing to do with this case." The agent further testified that "shotguns were manufactured in eight different gauges, that different manufacturers used different trigger pulls for their firearms, and that trigger pull could be affected by the cleanliness and wear of a gun." Four jurors were permitted to handle and "dry-fire" the shotgun brought in as a demonstrative aid at trial. We reversed the defendant's conviction, in part, because the TBI agent's testimony concerning the shotgun was irrelevant and, even if marginally relevant, its probative value was substantially outweighed by the danger of its confusing the jury. Tenn. R. Evid. 401, 402, 403. It was significant in Eric Williams that the defendant's "sole defense was that he did not intend to shoot the victim." Moreover, defense counsel argued in closing that the defendant and the victim were "fighting back and forth literally" and that the gun "[went] off while [the defendant] was poking right up against [the victim's] side." We further observed that "the trigger pull of [the defendant's] shotgun was highly relevant. The trigger pull of any other shotgun, though, was not relevant, and the trial court's decision to allow the jurors to experience the trigger pull on a shotgun that was not the murder weapon was clearly error."

In the case sub judice, prior to Officer Galloway's trial testimony, defense counsel objected to exhibits 12 and 17, photographs of a box found in Defendant Lee's bedroom that contained a black and silver, automatic BB gun. Defense counsel jointly argued that there had been no proof that the BB gun was the weapon used in the instant robbery and that it had no connection to the offense. Defense counsel argued that it therefore was not relevant and prejudicial under Rules 403, 404. The trial court ultimately overruled the objection and reasoned as follows:

> [R]ule 403 is a rule of inclusion. I only exclude evidence under 403 if the probative value is substantially outweighed by any unfair prejudice. And I just don't see it. And I think the State has a right to prove - - as far as relevance is concerned, a right to prove that within two days this man had in his bedroom a weapon that could have possibly been used in the robbery. And on the other hand, I'm not sure what the unfair prejudice is there . . .
>
> . . . .
>
> I mean, there's nothing wrong with owning a gun. There's nothing wrong with having a BB gun. It's nothing illegal about having a BB gun. I don't even think it's - - if it's a real gun maybe you could make a 404(b) proof of

- 21 -

other crimes argument. That would be borderline. There's nothing wrong with owning a gun in your home. But I'm going to note your objection. But I think it's certainly relevant to prove that [Defendant Lee] had the - - it could be - - in other words, [Defendant Lee] had the ability to - - [Defendant Lee] had a prop that might have been able to be used in the case. On the other hand, I just don't see any prejudice, any unfair prejudice. It's a BB gun.

The State then informed the trial court that it intended to allow the jury to "feel the gun and look at the gun and they can give it whatever weight they want." Defense counsel again objected, and the trial court sustained the objection. The court advised defense counsel that all of their concerns could be brought out on cross-examination. The record does not reflect that the jurors physically handled the BB gun at trial.

As an initial matter, unlike in Eric Williams, the BB gun here was recovered from Defendant Lee's home some two days after the robbery. It was not a demonstrative aid and was admitted into evidence during trial. More importantly, the Defendant's defense did not hinge on the mechanics or operation of the weapon as it did in Eric Williams. Rather, Defendant Lee claimed he was not involved in a robbery at all. In our view, the discovery of a BB gun in his possession two days after the robbery made it more probable than not that an armed robbery occurred in this case. In addition, even though the victim provided a slightly different description of the weapon that was held against her back and her neck during the robbery, we cannot say that this was material. See, e.g., State v. Kelvin Reed, No. W2009-00589-CCA-R3-CD, 2010 WL 4544777, at * 8 (Tenn. Crim. App. Nov. 10, 2010) (holding that testimony that the defendant owned a gun was admissible, in spite of the fact that no description was provided of the gun the defendant owned, because a gun was used in the murder). Accordingly, we are unable to conclude that the trial court abused its discretion in admitting the BB gun into evidence. Defendant Lee is not entitled to relief on this issue.

**Admissibility of Text Messages.** Defendant Lee next argues that the trial court violated the confrontation clause of the state and federal constitutions by admitting text messages contained in Defendant Goodwin's cell phone. In response, the State contends, and we agree, that the text messages were "squarely non-testimonial" as they were statements made in furtherance of a conspiracy. "[T]he threshold question in every case where the Confrontation Clause is relied upon as a bar to the admission of an out-of-court statement is whether the challenged statement is testimonial." Id. at 63 (citing Cannon, 254 S.W.3d at 301); see also Crawford v. Washington, 541 U.S. 36, 51-52 (2004). The Court in Crawford determined that statements qualify as testimonial when "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Crawford, 541 U.S. at 51-52.

- 22 -

Certain types of evidence fall easily within the definition of "testimonial," including "ex parte in-court testimony[,] . . . affidavits, custodial examinations, prior testimony [of a witness] that the defendant was unable to cross-examine, . . . depositions, . . . confessions," and "[s]tatements taken by police officers in the course of interrogations." Id. (internal quotation marks omitted). On the opposite end of the spectrum, "off-hand, overheard remark[s]," "business records," and "statements in furtherance of a conspiracy" are squarely non-testimonial under the Crawford standard. See id. at 51, 56; see also State v. McCoy, 459 S.W.3d 1, 14 (Tenn. 2014).

On August 29, 2014, the trial court conducted another pre-trial hearing to determine the admissibility of the text messages retrieved from Defendant Goodwin's phone. The State's position was that the text messages were in furtherance of the conspiracy to rob the victim and planned to use them against both Defendants at trial. Defense counsel for Defendant Goodwin argued that the text messages were hearsay and that ruling on its admissibility was premature because the State had yet to prove that Defendant Lee was involved in a conspiracy with Defendant Goodwin. Defense counsel for Defendant Lee joined in Defendant Goodwin's argument but additionally argued that there was a confrontation clause issue or "Bruton" issue. Defense counsel for Defendant Lee said that she would not be able to cross-examine Defendant Goodwin regarding the text messages if they were admitted at trial. The trial court ultimately determined that the text messages were admissible because "the substantive content of the text[s] . . . were made in furtherance of the conspiracy . . . [and] the context and [the Defendants'] actions provide circumstantial evidence in support of that conspiracy." The trial court nevertheless permitted defense counsel to renew their motion if the State failed to prove a conspiracy at trial.

Although Defendant Lee appeared to lodge a Bruton violation at trial, he does not provide any authority supporting this issue on appeal other than citation to Crawford.[3] Therefore, we review this issue within the confines of a confrontation clause violation only under Crawford. The text messages in question were exchanged between the Defendants' on the day of the robbery, including immediately before and after the robbery occurred. The substance of the text messages generally concerned where the

---

[3] In Bruton, the United States Supreme Court held that the admission in a joint trial of a codefendant's hearsay statements that incriminated the defendant violated the defendant's right of cross-examination guaranteed by the Confrontation Clause. Bruton v. United States, 391 U.S. 123, 135-37 (1968). "[T]he Bruton rule proscribes, generally, the use of one co-defendant's confession to implicate the other as being violative of the nonconfessing co-defendant's Sixth Amendment right of confrontation." State v. Elliot, 524 S.W.2d 473, 477 (Tenn. 1975). The co-conspirator exception, however, is a firmly rooted hearsay exception, and Bruton does not prohibit the use of a co-conspirator's statements against another co-conspirator. See State v. Alley, 968 S.W.2d 314, 317 (Tenn. Crim. App. 1997); see also State v. Lequire, 634 S.W.2d 608, 613 (Tenn. Crim. App. 1981).

Defendants were to meet, a description of the victim's car, and how Defendant Lee was to approach the victim's car. Nothing about the text messages indicate they were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." The text messages were clearly non-testimonial and made in furtherance of the conspiracy to rob the victim in this case. We therefore agree with the trial court and conclude that the text messages did not violate Defendant Lee's rights under the confrontation clause. He is not entitled to relief on this issue.

**Admissibility of Slang Terminology**. Defendant Lee next argues that the trial court erred in allowing an expert witness, Sergeant Pruitt, to interpret the meaning of slang terminology used by the co-defendant in text messages and in failing to require the State to qualify Sergeant Pruitt as an expert witness. In response, the State concedes that the trial court erred in failing to qualify Sergeant Pruitt as an expert witness; however, it insists that any error in admitting his testimony was harmless. For the reasons that follow, we agree with the State.

A trial court's decisions regarding the admissibility of opinion evidence are reviewed for abuse of discretion. See State v. McCloud, 310 S.W.3d 851, 865 (Tenn. Crim. App. 2009) (citing State v. Schiefelbein, 230 S.W.3d 88, 130 (Tenn. Crim. App. 2007)). Lay witnesses may give testimony in the form of an opinion where the testimony is "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). The testimony is not objectionable merely because it embraces an ultimate issue before the jury. Tenn. R. Evid. 704.

State and federal courts alike have frequently qualified law enforcement officers as expert witnesses to interpret conversations that use slang, street language, and jargon of the illegal drug trade. See, e.g., State v. Copeland, 226 S.W.3d 287, 299 (Tenn. 2007) (noting that "police officers and other law enforcement officials are regularly permitted to testify concerning the general way criminal schemes and enterprises operate and the usual meaning of criminal slang and code words") (internal citations and quotations omitted); see also State v. Elliot, 366 S.W.3d 139, 147-48 (Tenn. Crim. App. 2010) (permitting officer to testify as an expert regarding drug jargon and slang); see also State v. Miller, No. M2008-02267-CCA-R3-CD, 2010 WL 1644969, at *6 (Tenn. Crim. App. Apr. 22, 2010) (permitting officer to testify regarding the meaning of certain terms used in drug-related conversations); see also State v. Carey, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995) (permitting officer to testify about the language commonly used by drug dealers); see also United States v. Peoples, 250 F.3d 630, 641 (8th Cir. 2001). An officer's expert testimony however may not be admitted into evidence under the guise of lay opinions. This means that when a law enforcement officer is not qualified as an expert witness, his

testimony, as with any other lay opinion witness, remains governed by Rule 701 of the Tennessee Rules of Evidence.

The admission of lay opinion testimony is limited to those situations wherein the jury could not readily draw its own conclusions on the ultimate issue, without the aid of the witness's opinion testimony. Blackburn v. Murphy, 737 S.W.2d 529, 533 (Tenn. 1987). However, lay opinions must be based on the witness's own observations, should require no expertise, and ought to be within the range of common experience. State v. Samuel, 243 S.W.3d 592, 603 (Tenn. Crim. App. 2007). Lay testimony has been held to be improper where a government witness usurps the function of the jury. United States v. Grinage, 390 F.3d 746, 750-51 (2d Cir. 2004) (holding that testimony interpreting both calls that the jury heard and calls the jury did not hear and making inferences highlighting similarities between the defendant's calls and others made in furtherance of a conspiracy was not permissible lay testimony under Federal Rule of Evidence 701). While testimony interpreting telephone calls or text messages may not be permissible as lay testimony if the interpretation is based on expertise acquired through extensive police training and experience, Grinage, 390 F.3d at 750-51, such testimony may be permissible if it is not based on expertise but is based on personal observation and is particular to the case at hand. See United States v. Rollins, 544 F.3d 820, 833 (7th Cir. 2008) (concluding that agent's lay testimony was admissible because the conspirators did not use predetermined coded references but improvised code words extemporaneously, and the agent's testimony was therefore "based on his own personal observations and perceptions derived from this particular case").

At trial, on cross-examination by Defendant Goodwin, Sergeant Pruitt was challenged with the meaning of the phrase "hit a lick." The following exchange occurred between defense counsel for Defendant Goodwin and Sergeant Pruitt:

Question:     So, when you were asked what hit a lick means by [the State], you said it means to commit a robbery?

Answer:       Yes, sir.

Question:     And then you left it at that. You didn't explain any further. You just said it means to commit a robbery right; right?

. . . .

Question:     And I'll ask the question again. You said it means to commit a robbery?

Answer:     Yes sir.

Question:   Did you add anything to that definition?

Answer:     It means commit a robbery.

Question    And you are comfortable with the ladies and gentlemen of this jury believing that hit a lick means to commit a robbery?

Answer:     Yes, sir.

Question:   Then a few minutes ago when I asked you again what it means, you said to take something from somebody?

Answer:     To take or commit a robbery, that's what I said.

Question    Okay.  So, let's talk about that testimony.  Take something from somebody.  Well, when you take something from somebody if you don't use force, that's not a robbery is it?

Answer:     You use a weapon.

. . . .

Question    Okay. So taking something from somebody, if that's part of the definition of hit a lick, that doesn't mean to rob somebody, does it?

Answer:     It means that all day to me.

. . . .

Question:   Okay.  And let's talk about the source of your information on what hit a lick means.  Why do you know what that means?

Answer:     I done worked hundreds of robbery cases and when we read our reports and talk to suspects they will tell us, yeah, I hit that lick.  And we will ask them what does that lick mean? They will tell us we committed a robbery.

Defense counsel and Sergeant Pruitt continued to discuss the meaning of the

phrase "hit a lick" until the State objected. During a jury out conference, the trial court allowed defense counsel to refer to the internet for a definition of "hit a lick." Ultimately, defense counsel asked Sergeant Pruitt if "hit a lick" could also mean "a way of coming up with quick money[?]" Sergeant Pruitt agreed, and defense counsel for Defendant Goodwin replied, "I'm satisfied with that answer." Upon return of the jury, Sergeant Pruitt testified that "hit a lick" could mean a variety of things including burglary or an illegal way of gaining money fast.

Here, we agree with the State and Defendant Lee, and conclude that the trial court erred in allowing Sergeant Pruitt to provide lay opinion testimony regarding his understanding of the meaning of the phrase, "hit this lick." Sergeant Pruitt was not a participant in the text message exchange, he did not have personal knowledge of the facts being related in the text message conversation, and he did not observe the text message exchange as they occurred. Moreover, the testimony offered by Sergeant Pruitt was barred under Rule 701 because it was not based on Sergeant Pruitt's perception of the text messages as they occurred. Rather, Sergeant Pruitt testified that he knew of the meaning of the phrase based on his police training and expertise. Consequently, the meaning of the phrase "hit this lick" was not within the range of everyday common experience and the testimony of Sergeant Pruitt failed to qualify as lay opinion testimony.

We must now determine whether the admission of Sergeant Pruitt's testimony constituted harmless error. See State v. Powers, 101 S.W.3d 383, 413-414 (Tenn. 2003) (applying harmless error review to admissibility of lay opinion testimony); see also State v. Brice Cook, No. W2012-00406-CCA-R3-CD, 2013 WL 9570493, at * 8-10 (Tenn. Crim. App. Sept. 4, 2013) (same). The erroneous admission of testimony is not harmless when there is a significant possibility that the testimony had a substantial impact on the jury. We acknowledge, as did the State, that it was error for the trial court to allow Sergeant Pruitt to testify without first being qualified as an expert. We do not believe that his testimony concerning the phrase "hit this lick" more probably than not affected the verdict in this case. While the State failed to formally qualify Sergeant Pruitt as an expert, Sergeant Pruitt nonetheless testified that he learned of the phrase through his extensive experience as a law enforcement officer. He said he asked robbery suspects directly the meaning of the phrase, and they told him it meant to commit a robbery. Based on the record, the likelihood of Sergeant Pruitt being declared an expert in street jargon was high. Sergeant Pruitt was also extensively cross-examined or in the trial court's view "slaughtered" on this issue before the jury. Sergeant Pruitt conceded various meanings of the phrase "hit this lick," all of which concerned an illegal means of making money quickly. Finally, there was overwhelming proof of Defendant Lee's involvement in the robbery without Sergeant Pruitt's interpretation of "hit a lick" to mean a robbery. Accordingly, the trial court's error in admitting this lay testimony did not substantially impact the verdict in this case. Defendant Lee is not entitled to relief.

**Cumulative Error.**  In his final issue, Defendant Lee argues the cumulative effect of the errors committed during trial denied him a fair trial.  In State v. Hester, the Tennessee Supreme Court defined the doctrine of cumulative error:

> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010) (citations omitted).  The Hester court also found that United States v. Sepulveda, 15 F.3d 1161 (1st Cir. 1993), provided helpful insight regarding the cumulative error doctrine.  Hester, 324 S.W.3d at 77.  In Sepulveda, the United States Court of Appeals for the First Circuit provided guidance for appellate courts when considering whether the aggregated errors at trial deprived a defendant of a fair trial:

> Of necessity, claims under the cumulative error doctrine are sui generis.  A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the [State's] case.  The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

Sepulveda, 15 F.3d at 1196 (internal citations omitted).  Because we have determined that there was one error in this case, Defendant Lee is not entitled to relief under the cumulative error doctrine.

## CONCLUSION

Based on the above reasoning and authority, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

- 28 -